UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| **ALEXA CARTER,** | **CIVIL ACTION NO. 6:21-150-KKC** |
| **Plaintiff,** | |
| **v.** | **OPINION AND ORDER** |
| **UNION COLLEGE,** | |
| **Defendant.** | |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on Defendant Union College's motion for summary judgment (DE 32) and Plaintiff Alexa Carter's motion to strike (DE 42). For the following reasons, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion to strike as moot.

**I.    Background**

Plaintiff Alexa Carter was employed as a Wellness Coordinator for Defendant Union College's Center for Health and Wellness. (DE 32-2 at 14:18-14:20.) In that role, Plaintiff was responsible for teaching the "Silver Sneakers" group fitness class for senior citizens and maintaining personal training clients. (*Id.* at 121.) Plaintiff was also expected to maintain equipment inventories, develop a system of maintenance for the equipment, and perform other clerical tasks. (*Id.* at 122.) Plaintiff reported to Sean Trinque and Kateena Haynes, who also supervised Trinque. (DE 34-1 at 3:24-4:2.)

**A.    Plaintiff's Requests for Accommodations**

Due to the onset of the COVID-19 pandemic in March 2020, Plaintiff was allowed to work from home during the Center's temporary closure. (DE 32-2 at 48:14-48:19, 127.) In

May 2020, Plaintiff "informed Union College" of her pregnancy, and told Haynes and Trinque that she was pregnant. (*Id.* at 53:23-53:25; DE 34-2 at 7:6-7:14.) The Center reopened on June 1, 2020. (DE 32-5 ¶ 4.) On June 10, 2020, Plaintiff notified Lynn Smith, the Executive Director of Human Resources, about her pregnancy and requested information about accommodations. (DE 32-2 at 54:6-54:12, 131-33.) Smith responded and advised her on the process for requesting FMLA leave. (*Id.* at 54:13-55:3, 131-33.) In late June 2020, Plaintiff requested to work from home after "pregnancy" was added to the CDC's list of conditions that were "high-risk" for illness due to COVID-19. (DE 32-2 at 139.) After Plaintiff requested this accommodation, Haynes contacted Smith via email for guidance to discuss the "necessity of [Plaintiff] being on-site." (DE 34-4 at 1.) Haynes described Plaintiff as "integral to the normal operations of the Center" and as providing "a critical function" because she was the "only certified Silver Sneakers instructor and certified personal trainer" at the Center. (*Id.*) By July 13, 2020, Plaintiff was working remotely part-time. (*Id.* at 62:4-62:12.) Dr. Marcia Hawkins, the president of Union College, was aware of Plaintiff's pregnancy by September 3, 2020. (DE 34-16 at 2:8-2:14.)

On August 2, 2020, Carter told Haynes that she was not comfortable working at the front desk because of exposure to the public and asked to be excused from those duties. (DE 32-2 at 149.) To create a barrier between her and the public, Haynes offered to install Plexiglass around the front desk. (DE 34-2 at 11:13-11:22.) Plaintiff was not agreeable to this accommodation. (*Id.* at 12:3-12:17, 13:21-14:11.) Her front desk duties were eventually reassigned to work study students. (DE 32-2 at 68:14-69:9, 154-55.)

On August 10, 2020, Plaintiff provided a doctor's note to Haynes stating that Plaintiff needed to work remotely "when possible." (DE 32-2 at 156-57; DE 34-2 at 34:14-35:1.) Haynes and Smith "continu[ed] to work with [Plaintiff] try to come up with some sort of agreement as her job did require a presence at the center and just continually tr[ied] to work

with her to come to some sort of agreement." (DE 34-2 at 35:6-35:12.)  To distance her from participants, Haynes offered to install Plexiglass in the multi-purpose room where Plaintiff held Silver Sneakers classes, but Plaintiff would not agree to this accommodation.  (*Id.* at 11:23-12:17, 14:19-14:24.)  Haynes also suggested that Plaintiff could come into the facility at night after it was closed to clean equipment and complete paperwork.  (*Id.* at 12:18-13:1, 15:5-15:14.)  Again, Plaintiff was not agreeable to this accommodation.  (*Id.*)

In August 2020, Plaintiff also requested to transition her classes and training sessions to a "virtual setting." (DE 32-2 at 156.)  Haynes agreed to this solution.  (*Id.* at 161.)  Haynes directed Plaintiff to submit a ticket with the technology department to obtain and set up the necessary equipment.  (*Id.* at 159.)  Plaintiff submitted the ticket.  (DE 34-2 at 37:22-38:1.)  Haynes told the technology department to move forward with Plaintiff's request.  (*Id.* at 38:9-39:19.)  Plaintiff never submitted the requisite purchase order for the equipment.  (*Id.*)

In October 2020, Haynes and Smith collaborated on a formal accommodation plan for Plaintiff.  (*Id.*at 38:24-39:21.)  This arrangement would allow Plaintiff to perform the majority of her duties at home.  (DE 32-2 at 93:13-93:21.)  On November 9, 2020, Plaintiff emailed Smith to finalize her FMLA paperwork before her December due date.  (DE 34-15 at 1.)  Smith never responded.  (DE 32-6 at 23:15-23:21.)

## B.   Plaintiff's Complaints Against Trinque

According to Plaintiff, on July 6, 2020, she informed Trinque that she was experiencing pregnancy-related pain and needed medical treatment.  (DE 37-1 at 1.)  Trinque allegedly told two other employees that Plaintiff was experiencing pain and sought treatment.  (*Id.*)  He also told them that he "thought men and women were equal" and "insinuated" that he was surprised that Plaintiff needed medical care.  (*Id.*)  He further stated that Plaintiff's pain was "not significant" and that he "experienced that pain before, so he

didn't understand why [Plaintiff] had concern." (*Id.*)  Plaintiff reported these comments to Haynes, who sought advice from Dr. Hawkins. (DE 34-2 at 18:7-18:16, 19:25-20:10.)  Plaintiff subsequently filed a formal complaint against Trinque on July 14, 2020. (DE 32-6 at 29.)

> In her complaint, Plaintiff wrote, in part:
>
> On Monday July, 6th, I (Alexa) had experienced pregnancy related pain that was in need of medical attention.  I had contacted my doctor while on my lunch break and was told that I needed to be seen right away.  I contacted Sean Trinque by phone to explain to him the situation and that I would not be returning to work for the remainder of the day.
>
> [Trinque] . . . divulged my personal health information by stating that I had been experiencing pregnancy related pain.  He then began to discuss how he thought men and women were equal and insinuated that he was surprised that I needed to visit my doctor.  I was also informed that he discussed how the pain I was feeling was not significant and that he experienced that pain before, so he didn't understand why I had concern.  Later that same day, I was approached by a different employee who shared the exact same statements to me and explained how uncomfortable they felt as he was discussing this information amongst employees and in the lobby of the facility not concerned that members could also be within earshot of the conversation.
>
> [I] was informed of another incident by an employee where Sean had once again spoke about my pregnancy related pain and used it in a joking manner[.]
>
> . . . According to the employees who witnessed these events, the above incidences were clear workplace violations that are both discriminatory as well as a case of harassment. . . . I am very upset that my personal health information was discussed and in a way that was very demeaning and disrespectful and with employees that I directly help supervise. . . .

(DE 37-1 at 1.)  Smith began an investigation into Carter's allegations, ultimately finding that Trinque violated Union College policy by "exhibit[ing] inappropriate and unprofessional behavior." (DE 32-6 at 5:2-5:4, 10:7-11:7, 35-36.)  As punishment, Trinque was required to complete individualized training, attend mediation with Plaintiff, and apologize to Plaintiff. (*Id.* at 35-36.)

On August 18, 2020, Plaintiff filed another complaint against Trinque.  (DE 37-6 at

1.)  In that complaint, Plaintiff stated, in part:

> I'd like to report that after I had filed a formal complaint, I have been made
> aware of comments Sean has made to other employees that I feel is in direct
> response to the complaint.
>
> Two employees, Hailee Hinthorne and Haley Lyell were witness to comments
> Sean made to them stating that he is so glad to have them there because other
> employees can't take a joke.

*Id.*  After interviewing these employees, Smith concluded that these retaliation allegations

could not be substantiated.  (DE 32-6 at 43.)

## C.    Defendant's Reduction in Force

On October 30, 2020, Defendant's Board of Trustees ordered it to reduce expenses by

$500,000 through salary reductions.  (DE 32-3 ¶ 9, at p. 39.)  Dr. Hawkins decided to

eliminate 20 positions that she viewed as "non-essential" as part of a reduction in force.  (*Id.*

¶ 10.)  According to Dr. Hawkins, she decided which positions to eliminate by determining if

a given position's duties were essential or if those duties could be reallocated to other

employees.  (*Id.* ¶ 11.)  She gathered this information based on a review of staff listings and

job descriptions.  (*Id.*)

Dr. Hawkins maintains that she "alone made the decision about which positions to

eliminate."  (*Id.* ¶ 17.)  In her deposition, Dr. Hawkins testified, "I didn't initially base my

decisions on any input . . . I didn't want anyone else to have to think through the elimination

of people.  So I did it."  (DE 32-7 at 3:20-4:4.)  Supervisors did not provide her with any

information to use in making her decisions.  (*Id.* at 4:10-4:13.)  Haynes confirmed that she

"wasn't involved as far as like any kind of vote or any kind of decision-making."  (DE 34-2 at

48:18-48:22.)  In an "email discussion" with Steve Morris, the CFO of the College, Haynes

mentioned that Plaintiff's position "was not essential" to the Wellness Center but did not

mention her name.  (*Id.* at 49:11-50:7.)  This comment arose in discussions about "what [the

Center] had to have, like what was bare bones, what [it] could survive with and . . . what [the Center] absolutely had to have." (*Id.* at 49:25-50:7.)

On or about November 3, 2020, Dr. Hawkins made the decision to eliminate Plaintiff's position and terminate her. (DE 32-3 ¶ 12.). Dr. Hawkins compiled a chart of the non-essential positions chosen for elimination. (*Id.* ¶ 12, at p. 49.) The chart included the position of "Membership Srvs Mgr/Trainer," and Plaintiff's name was listed beside that position in the chart. (*Id.* at 49.) Dr. Hawkins states that the "Membership Srvs Mgr/Trainer" position referred to Plaintiff's Wellness Coordinator position. (*Id.* ¶ 12.) Plaintiff was officially terminated on November 13, 2020. (Am. Compl. ¶ 7; DE 32-6 at 23:17:23-21.)

Plaintiff brings the following claims against Defendant: (1) sex and pregnancy discrimination in violation of the Kentucky Civil Rights Act (the "KCRA") (KRS § 344.010 *et seq.*) (Am. Compl. ¶¶ 30-35); (2) retaliation in violation of the KCRA (KRS § 344.280) (Am. Compl. ¶¶ 36-40); and (3) interference and retaliation in violation of the Family and Medical Leave Act (the "FMLA") (29 U.S.C. § 2611) (Am. Compl. ¶¶ 41-46). Defendant now moves for summary judgment as to all claims. (DE 32.) Plaintiff also moves to strike two supplemental declarations that Defendant filed in conjunction with its reply brief. (DE 42.)

## II.    Motion for Summary Judgment

### A.    Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden and must identify "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and quotation marks omitted). The Court views all evidence, facts, and inferences in favor of the non-

moving party.  *See McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  "In order to defeat a summary judgment motion, . . . [t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor."  *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

**B.     Sex and Pregnancy Discrimination Claim**

The KCRA prohibits an employer from discriminating against an employee "with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex."  KRS § 344.040(1)(a).  The term "because of sex" includes discrimination because of "pregnancy, childbirth, or related medical conditions."   KRS § 344.030(8)(a). "[C]laims for pregnancy discrimination under [the KCRA] are analyzed in the same way as those under Title VII."  *Bledsoe v. Dialysis Clinic, Inc.*, CIVIL ACTION NO. 05-101, 2006 WL 8445583, at *4 (E.D. Ky. June 19, 2006).

In cases like this one, where the plaintiff has no direct evidence of pregnancy-based discrimination, the evidentiary framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) applies to her claims.[1] *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572-73 (6th Cir. 2006).  First, the burden is on the plaintiff to establish a prima facie case of pregnancy discrimination.  *Prebilich-Holland v. Gaylord Ent. Co.*, 297 F.3d 438, 442 (6th Cir. 2002).  "To establish a prima facie case of pregnancy discrimination, the plaintiff must show that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the

---

[1] While Plaintiff labels her claim as "a sex and pregnancy discrimination claim," she only appears to focus on pregnancy discrimination, a subset of sex discrimination under the KCRA.  *See* § 344.030(8)(a).  Therefore, the Court's analysis will likewise only focus on pregnancy discrimination without regard to any other claims for sex discrimination.

adverse employment decision." *Id.* (citations and quotation marks omitted).  If the plaintiff meets her burden, "the burden of production shifts to the defendant to articulate a 'legitimate, nondiscriminatory reason' for the termination that is separate and distinct from [the plaintiff's] pregnancy." *Bledsoe*, 2006 WL 8445583, at *4 (citation omitted).  If the defendant meets that burden, the plaintiff must show that "the defendant's proffered reason was simply a mere pretext for unlawful discrimination and was not the actual motivating factor for the decision." *Id.*

### 1.   Prima Facie Case

Defendant does not dispute that Plaintiff has established the first three prongs of her prima facie case.  Instead, the real dispute is whether Plaintiff has shown a nexus between her pregnancy and her termination.

To satisfy the nexus requirement, the plaintiff must show that her "employer had actual knowledge of her pregnancy at the time that the adverse employment action was taken." *Prebilich-Holland*, 297 F.3d at 444.  In addition to knowledge, the plaintiff must provide evidence of (1) temporal proximity; (2) discriminatory comments; (3) "similarly situated" employees receiving more favorable treatment; or (4) any other proof establishing a connection between the plaintiff's pregnancy and the adverse employment action. *Kubik v. Cent. Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 581-82 (6th Cir. 2017).  Temporal proximity considers the length of time "between the employer's learning of an employee's pregnancy and an adverse employment action taken with respect to that employee." *Asmo v. Keane, Inc.*, 471 F.3d 588, 594 (6th Cir. 2006).

As evidence of the nexus between her pregnancy and her termination, Plaintiff points to the following: (1) Dr. Hawkins, who was the ultimate decisionmaker, knew of Plaintiff's pregnancy; (2) Smith received Plaintiff's leave request four days before Plaintiff was

terminated, and at the time, Smith was actively participating in the reduction in force process; (3) Haynes recommended terminating Plaintiff as part of the reduction in force to the CFO, and at the time, Haynes knew of Plaintiff's pregnancy; and (4) Carter engaged in the "protected activity of officially requesting maternity leave before being terminated." (DE 34 at 12.)

Although Dr. Hawkins knew of Plaintiff's pregnancy, that alone cannot establish nexus, absent other evidence connecting Dr. Hawkins' knowledge of Plaintiff's pregnancy to Plaintiff's termination.  Plaintiff submits evidence showing that, at latest, Dr. Hawkins learned of Plaintiff's pregnancy by September 3, 2020.  (DE 34-16 at 2:8-2:14.)  Defendant does not submit any evidence to indicate that Dr. Hawkins knew before that date.  Defendant points to evidence that in May 2020, Plaintiff "informed Union College" of her pregnancy, and told Haynes and Trinque that she was pregnant.  (DE 32-2 at 53:23-53:25; DE 34-2 at 7:6-7:14.)  However, what matters for purposes of the nexus requirement is when the *decisionmaker* acquired knowledge of the plaintiff's pregnancy.  *See Johnson v. Evolent Health*, LLC, Case No. 22-5574, 2023 WL 2326676, at *5 (6th Cir. Mar. 2, 2023).  Both Plaintiff and Defendant agree that Dr. Hawkins was the ultimate decisionmaker responsible for terminating Plaintiff.  (DE 32-1 at 23; DE 34 at 12.)  Defendant provides no evidence that when Plaintiff "informed Union College" of her pregnancy, this included informing Dr. Hawkins, or that Haynes or Trinque notified Dr. Hawkins about Plaintiff's pregnancy prior to September 3, 2020.  Construing the evidence in the light most favorable to Plaintiff, the Court must assume that Dr. Hawkins learned of Plaintiff's pregnancy on September 3, 2020.  Dr. Hawkins made the decision to terminate Plaintiff on or about November 3, 2020.  (DE 32-3 ¶ 12.).  Therefore, Plaintiff was terminated only two months after Dr. Hawkins learned of her pregnancy.

The Sixth Circuit has held that a period of only two months is sufficient temporal proximity to establish a nexus between the plaintiff's pregnancy and her termination.  *See Asmo*, 471 F.3d at 594.  Given the temporal proximity between when Dr. Hawkins learned of Plaintiff's pregnancy and Plaintiff's termination, Plaintiff has satisfied the nexus requirement for her pregnancy discrimination claim.

Therefore, Plaintiff has established a prima facie case of pregnancy discrimination. Because this evidence alone is sufficient to fulfill the nexus requirement, the Court need not assess Plaintiff's other arguments.

### 2.    Legitimate, Nondiscriminatory Reason

Since Plaintiff has met her burden to establish a prima facie case of pregnancy discrimination, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's termination.  The purported reason for Plaintiff's termination was the elimination of her position as part of Defendant's college-wide reduction in force after the Board of Trustees demanded that Defendant reduce expenses by $500,000.  (DE 32-1 at 17-18.)  Plaintiff does not dispute that this was a legitimate, nondiscriminatory reason for her termination.  Therefore, the burden shifts back to Plaintiff to show that this reason is mere pretext for Defendant's unlawful discrimination against her.

### 3.    Pretext

A plaintiff may show pretext by demonstrating that the employer's purported nondiscriminatory reason "1) had no basis in fact; (2) did not actually motivate the employer; or (3) was insufficient to warrant the adverse employment action."  *Johnson*, 2023 WL 2326676, at *6 (citation and quotation marks omitted).  However, at all times, the plaintiff retains the burden of showing that her employer discriminated against her because of her pregnancy. *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 666-67 (6th Cir. 2000). Moreover, "evidence of the falsity of the employer's explanation, coupled with the elements of the

plaintiff's prima facie case, could possibly, even without additional evidence of discrimination, justify an inference of discrimination." *Tysinger*, 463 F.3d at 576.

Plaintiff apparently replies upon all of three pathways to argue that Defendant's purported reason for her termination was pretext. (DE 34 at 15.) She further states, "[Defendant] has presented multiple inconsistencies and contradictions that suggest pretext." (*Id.*) The alleged contradictions are: (1) "Dr. Hawkins claimed she was the sole decisionmaker while Haynes claimed she had influence;" (2) "Haynes initially said that Carter was essential to the Wellness Center when Carter initially requested accommodations, but stated that Carter was not essential when she was trying to convince the CFO to terminate Carter;" and (3) "Dr. Hawkins claimed that she was eliminating positions rather than targeting individuals for termination, but the position she claimed she eliminated in connection with Carter's termination was not Carter's position." (*Id.*) The Court will address all three arguments in turn.

While Plaintiff argues that Haynes had influence over Dr. Hawkins' decision, she fails to support that assertion with any evidence. Defendant, on the other hand, submits evidence that Dr. Hawkins was the sole decisionmaker in determining which employees to terminate as part of the reduction in force. In her declaration, Dr. Hawkins states that she "alone made the decision about which positions to eliminate." (DE 32-3 ¶ 17.) When asked about how much she relied on recommendations from supervisors to assess which positions were essential, Dr. Hawkins answered, "I didn't initially base my decisions on any input . . . I didn't want anyone else to have to think through the elimination of people. So I did it." (DE 32-7 at 3:20-4:4.) She also testified that supervisors did not provide her with any information to use in making her decisions. (*Id.* at 4:10-4:13.) Haynes also testified that she "wasn't involved as far as like any kind of vote or any kind of decision-making." (DE 34-2 at 48:18-48:22.) In an "email discussion" with Morris, Haynes stated that Plaintiff's position "was not

essential" to the Wellness Center but did not mention Plaintiff's name.  (*Id.* at 49:11-50:7.)
Plaintiff submits no evidence to show that Morris played any part in deciding to terminate
her, that Morris shared Haynes' input with Dr. Hawkins, or that Haynes' input was ever
considered as part of the termination decision.  Plaintiff fails to provide any evidence to
suggest that Haynes actually mentioned Plaintiff or her pregnancy in providing this input to
Morris.  Without more, the evidence is insufficient to dispute that Dr. Hawkins was the sole
decisionmaker behind Plaintiff's termination and insufficient to establish that Haynes
influenced Dr. Hawkins' decision.  This is not enough to show that Defendant's reason for
terminating Plaintiff was mere pretext.

Next, Plaintiff argues that although Haynes later told Morris that Plaintiff's position
was "not essential" to the Wellness Center (DE 34-2 at 49:21-50:7), she previously described
Plaintiff as "integral to the normal operations of the Center" and as providing "a critical
function" (DE 34-4 at 1).  This fails to establish pretext for several reasons.  Haynes'
statements are not inconsistent because they occurred in different contexts.  When Haynes
described Plaintiff's position as "integral" and "critical," she did so after Plaintiff first
requested accommodations due to her pregnancy.  (DE 34-4 at 1.)  The comments arose in the
context of Haynes discussing the "necessity of [Plaintiff] being on-site" since she was the "only
certified Silver Sneakers instructor and certified personal trainer" at the Center.  (*Id.*)  But
when Haynes described Plaintiff's position as "not essential," she did so after the mandate
from the Board to reduce expenses and in discussions about "what [the Center] had to have,
like what was bare bones, what [it] could survive with and . . . what [the Center] absolutely
had to have."  (DE 34-2 at 49:25-50:7.)  Regardless, as previously discussed, Plaintiff provides
no evidence that Morris played any part in deciding to terminate her, that Morris shared
Haynes' input with Dr. Hawkins, or that Haynes' input was ever considered as part of the
termination decision.  There is no evidence that Haynes actually mentioned Plaintiff or her

12

pregnancy in providing this input to Morris.  Therefore, Plaintiff cannot show pretext through Haynes' statements about Plaintiff's position.

Lastly, Plaintiff contends that her position was not the position chosen for elimination because Dr. Hawkins eliminated the "Membership Srvs Mgr/Trainer" position, and Plaintiff's position was the "Wellness Coordinator." (DE 34 at 15.)  According to Plaintiff, the difference between these two titles shows that she was "target[ed]" for termination.  (*Id.*)  Defendant submits evidence that Dr. Hawkins eliminated those positions that she deemed "non-essential." (DE 32-3 ¶ 10.)  To make this determination, she examined whether the duties performed by the position were essential or could be reallocated to other employees.  (*Id.* ¶ 11.)  She gathered this information based on a review of staff listings and job descriptions. (*Id.*)  She then compiled a chart listing the positions eliminated as part of the reduction in force, which included the position of "Membership Srvs Mgr/Trainer." (*Id.* ¶ 12, at p. 49.) Plaintiff's name is listed beside that position. (*Id.* at 49.)  During her deposition, Dr. Hawkins acknowledged that the "Membership Srvs Mgr/Trainer" position was ultimately eliminated, but she did not "specifically recall" Plaintiff's title.  (DE 34-16 at 6:24-7:6.)  However, in her declaration, Dr. Hawkins states she referred to Plaintiff's Wellness Coordinator position as the "Membership Srvs Mgr/Trainer" in the chart. (DE 32-3 ¶ 12.)  Plaintiff fails to dispute that the "Membership Srvs Mgr/Trainer" position was just another title for the "Wellness Coordinator" position.  Plaintiff does not provide any evidence to show that another employee held this role or undertook these duties.  The fact that the title for Plaintiff's position may have differed from how her position was described in staff listings or job descriptions does not raise an inference of discrimination.  Plaintiff has not submitted sufficient evidence to establish pretext on this ground.

Because Plaintiff has not met her burden to demonstrate that Defendant's purported reason for her termination was pretext for discrimination, her sex and pregnancy

discrimination claim fails.  Therefore, the Court grants summary judgment for Defendant as to Plaintiff's sex and pregnancy discrimination claim, and dismisses that claim.

### C.    KCRA Retaliation Claim

The KCRA forbids an employer from "retaliat[ing] or discriminat[ing] in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter."  KRS § 344.280(1). "Retaliation claims under the KCRA are evaluated under the same standard [used] to evaluate federal Title VII claims."  *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 504 (6th Cir. 2014).

KCRA retaliation claims based on circumstantial evidence are also analyzed according to the *McDonnell Douglas* framework described *supra*.  *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009).  A plaintiff establishes a prima facie case of retaliation by proving that (1) the plaintiff engaged in "protected activity," (2) the employer had knowledge of the plaintiff's protected activity, (3) the employer subsequently took "an adverse employment action" against the employee, and (4) a "causal connection" between the protected activity and the adverse employment action.  *Id.* (citation and quotation marks omitted).

### 1.    Prima Facie Case

Parties do not disagree that Defendant had knowledge that Plaintiff engaged in any of alleged protected activities.  The Court will therefore address the remaining elements of Plaintiff's prima facie case.

### a.    Protected Activity

The KCRA covers two types of protected activity: (1) whenever an employee "opposed a practice declared unlawful by [the KCRA]" or (2) whenever an employee "has made a charge, filed a complaint, testified, assisted, or participated in any manner in any

investigation, proceeding, or hearing under [the KCRA].”  *See* KRS § 344.280(1); *Marshall v. Super Serv., LLC*, Civil Action No. 6:14-229-DCR, 2016 WL 1389595, at *12 (E.D. Ky. Apr. 6, 2016).  The first category is referred to as the “opposition clause.”  *Id.*  “Activities prior to the instigation of statutory proceedings are analyzed under the opposition clause.”  *Id.* (citation and quotation marks omitted).

Plaintiff claims that she engaged in the following protected activities: (1) requesting accommodations for her pregnancy, (2) reporting Trinque for discrimination and harassment (her first complaint), and (3) reporting Trinque for retaliation (her second complaint).  (DE 34 at 14.)  Because these activities occurred prior to any statutory proceedings, they fall under the opposition clause of the KCRA.  Under this clause, the “employee must clearly challenge an employment practice that she believes is unlawful.”  *Popeck v. Rawlings Co. LLC*, CIVIL ACTION NO. 3:16-CV-00138-GNS-DW, 2018 WL 2074198, at *14 (W.D. Ky. May 3, 2018).

“Although a person making a request for a reasonable accommodation might not literally ‘oppose’ an unlawful practice . . . , the Sixth Circuit and most circuits agree that a request for a reasonable accommodation is a protected act under the [American with Disabilities Act (“ADA”)].”  *Planck v. EnerSys Del., Inc.*, Civil Action No. 5:14-316-KKC, 2015 WL 1544785, at *3 (E.D. Ky. Apr. 7, 2015).  However, pregnancy is generally not a disability under the ADA.  *Ramirez v. Bolster & Jeffries Health Care Grp., LLC*, 277 F. Supp. 3d 889, 911 (W.D. Ky. 2017).  To the extent that Plaintiff requested accommodations due to her pregnancy pursuant to the ADA, she did not engage in a protected activity.  To the extent that Plaintiff requested these accommodations pursuant to the FMLA, “[t]aking FMLA leave is not a protected activity for the purposes of the KCRA anti-retaliation provision.”  *Marrero-Perez v. Yanfeng US Auto. Interior Sys. II LLC,* Civil Action No. 3:21-cv-645-RGJ, 2022 WL 4368165, at *4 (W.D. Ky. Sept. 21, 2022) (citation and quotation marks omitted).

15

Plaintiff's first complaint against Trinque poses a closer call.  In that complaint, she reported Trinque for comments he made to other employees.  She wrote, in part:

> "[Trinque] . . . divulged my personal health information by stating that I had been experiencing pregnancy related pain.  He then began to discuss how he thought men and women were equal and insinuated that he was surprised that I needed to visit my doctor.  I was also informed that he discussed how the pain I was feeling was not significant and he experienced that pain before, so he didn't understand why I had concern.  Later that same day, I was approached by a different employee who shared the exact same statements to me and explained how uncomfortable they felt as he was discussing this information amongst employees and in the lobby of the facility not concerned that members could also be within earshot of the conversation.
>
> [I] was informed of another incident by an employee where Sean had once again spoke about my pregnancy related pain and used it in a joking manner[.]
>
> . . . According to the employees who witnessed these events, **the above incidences were clear workplace violations that are both discriminatory as well as a case of harassment**. . . . I am very upset that my personal health information was discussed and in a way that was very demeaning and disrespectful and with employees that I directly help supervise. . . .

(DE 37-1 at 1 (emphasis added).)

Defendant frames this letter as Plaintiff merely complaining about Trinque divulging her personal health information, which is not prohibited by the KCRA.  (DE 32-1 at 21-22.) However, Plaintiff also mentioned that Trinque's comments were "discriminatory," "harassment," and "clear workplace violations."  As previously discussed, the KCRA prohibits discrimination because of pregnancy.  § 344.040(1)(a); § 344.030(8)(a).  Viewing the evidence in the light most favorable to Plaintiff, her report of Trinque's comments about her pregnancy and her description of those comments as "discriminatory," harassment," and "clear workplace violations" are sufficient evidence of her challenging an employment practice that she viewed as unlawful.  Therefore, Plaintiff's first complaint against Trinque constitutes protected activity.

However, Plaintiff's second complaint against Trinque does not clearly oppose an unlawful practice under the KCRA. In that complaint, Plaintiff stated:

> I'd like to report that after I had filed a formal complaint, I have been made aware of comments Sean has made to other employees that I feel is in direct response to the complaint.
>
> Two employees, Hailee Hinthorne and Haley Lyell were witness to comments Sean made to them stating that he is so glad to have them there because other employees can't take a joke.

(DE 37-6 at 1.) Plaintiff does not point to a provision of the KCRA that prohibits vague, offhanded comments about the abilities of employees to take a joke. Accordingly, Plaintiff's report of these comments was not protected activity.

Therefore, the only protected activity that Plaintiff engaged in was her first complaint against Trinque.

### b.    Adverse Employment Action

Plaintiff alleges that the following adverse employment actions were taken against her: (1) her requests for accommodations were denied; (2) Trinque further retaliated against her through his comments that "other employees can't take a joke;" and (3) she was ultimately terminated. (DE 34 at 14.) While the parties do not explicitly disagree as to whether these actions were adverse employment actions, they do disagree as to whether Defendant denied her requests for accommodations and whether Trinque's additional comments were retaliatory. (DE 41 at 1, 6-9, 12.) Therefore, the Court must first assess if these actions constituted adverse employment actions before it can determine if Plaintiff submitted sufficient evidence of a causal connection between these actions and the alleged protected activity.

An adverse employment action is a "materially adverse change in the terms or conditions of employment because of the employer's actions." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007) (citation and quotation marks omitted). "A

materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 594 (citation and quotation marks omitted).

Plaintiff has not submitted evidence that her requests for accommodations were denied after she first reported Trinque. Instead, the evidence actually indicates the opposite. After requesting accommodations in late June 2020, Plaintiff was working remotely part-time as of July 13, 2020. (DE 32-2 at 62:4-62:12, 139.) After Plaintiff provided a doctor's note to Haynes stating that Plaintiff needed to work remotely "when possible," Haynes and Smith "continu[ed] to work with [Plaintiff] try to come up with some sort of agreement as her job did require a presence at the center and just continually tr[ied] to work with her to come to some sort of agreement." (DE 34-2 at 35:6-35:12.) To allay concerns about Plaintiff's exposure to COVID-19, Haynes offered to put Plexiglass around the front desk and in the multi-purpose room where Plaintiff held fitness classes, but Plaintiff was not agreeable to either accommodation. (*Id.* at 11:13-12:17, 13:21-14:11,14:19-14:24.) Plaintiff's front desk duties were later reassigned to work study students. (DE 32-2 at 68:14-69:9, 154-55.) Haynes also suggested that Plaintiff come into the facility at night after it was closed to clean equipment and complete paperwork, but Plaintiff did not agree to that accommodation. (DE 34-2 at 12:18-13:1, 15:5-15:14.) Haynes also agreed to Plaintiff's request to conduct training sessions and fitness classes virtually. (DE 32-2 at 161.) Even though Haynes instructed the technology department to move forward with Plaintiff's request to purchase equipment that would allow her to hold virtual classes, Plaintiff herself failed to submit a purchase order for the equipment. (DE 34-2 at 38:9-39:19.) Further, Haynes and Smith collaborated on a formal accommodation plan for Plaintiff in October 2020, which allowed Plaintiff to perform the majority of her duties at home. (*Id.* at 38:24-39:21; DE 32-2 at 93:13-93:21.)

As proof that Defendant denied her accommodation requests, Plaintiff claims Trinque "commandeered" a monitor that she needed to hold classes virtually. (DE 34 at 14.) Plaintiff mischaracterizes the utility of that monitor. The monitor was Trinque's personal television that he used for lifeguard training courses and as an additional screen for his laptop. (DE 34-13 at 2:24-4:10.) Evidence instead shows that Plaintiff needed to obtain the appropriate monitor from the technology department. (*Id.* at 2:24-3:17.) To the extent that Plaintiff argues that Haynes "insisted" that she work in person, she has not submitted any evidence to support that claim beyond her conclusory statement. (DE 34 at 14.) Because Plaintiff cannot show that her accommodation requests were denied, any alleged denial of her requests does not constitute an adverse employment action.

Trinque did not take an adverse employment action against Plaintiff when he commented about the ability of employees to "take a joke" because those comments did not materially change the terms and conditions of Plaintiff's employment. However, Plaintiff's termination is undoubtedly an adverse employment action. Therefore, the Court's analysis will proceed based on the conclusion that Plaintiff's termination was the sole adverse employment action taken against her.

### c. Causal Connection

Therefore, Plaintiff must establish a causal connection between her initial complaint against Trinque and her termination. Plaintiff relies on the nexus arguments from her sex and pregnancy discrimination claim to argue causal connection for this claim, stating, "As discussed above, both decisionmaker knowledge and temporal proximity are present." (DE 34 at 14.) Accordingly, her arguments for causal connection as to this claim are: 1) Dr. Hawkins, who was the ultimate decisionmaker, knew of Plaintiff's pregnancy; (2) Smith received Plaintiff's leave request four days before Plaintiff was terminated, and at the time, Smith was actively participating in the reduction in force process; (3) Haynes recommended

terminating Plaintiff as part of the reduction in force to the CFO, and at the time, Haynes knew of Plaintiff's pregnancy; and (4) Carter engaged in the "protected activity of officially requesting maternity leave before being terminated." (*Id* at 12.) Unlike the Court's conclusion regarding her sex and pregnancy discrimination claim, Plaintiff fails to establish a causal connection between her first complaint against Trinque and her termination.

As it relates to this claim, the relevant question is not whether Dr. Hawkins knew of Plaintiff's pregnancy but whether she knew of Plaintiff's protected activity. *Scott v. Haier U.S. Appliance Sols., Inc.*, CIVIL ACTION NO. 3:19-CV-844-CRS, 2021 WL 2587163, at *8 (W.D. Ky. June 23, 2021) ("[Plaintiff] must demonstrate that those who took an adverse employment action . . . knew about [her] protected activity."). Elsewhere in her response, Plaintiff provides evidence that Dr. Hawkins knew of Plaintiff's initial complaint against Trinque shortly after Plaintiff raised her complaint in July 2020. (DE 34-2 at 18:7-18:16, 19:25-20:10; DE 34-16 at 3:1-3:4.) A causal connection requires "a close temporal relationship between the protected activity and the adverse action." *Asbury Univ. v. Powell*, 486 S.W.3d 246, 258 (Ky. 2016) (citation and quotation marks omitted). Plaintiff was terminated in November 2020, four months after Plaintiff first reported Trinque and Dr. Hawkins learned of Plaintiff's complaint. This temporal relationship is insufficient to find a causal connection between Plaintiff's initial complaint against Trinque and her termination. *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (finding that the period of "two to five months" between the plaintiff's protected activity and the adverse employment actions taken against him was "insufficient to create a triable issue" because of "loose temporal proximity").

Plaintiff's other asserted bases for causation similarly fail. On its face, any evidence that Smith received Plaintiff's leave request at the time that she was involved in the reduction in force process does not bear on whether Plaintiff was terminated because she filed a complaint against Trinque. Further, Plaintiff does not articulate any specific evidence

showing that Smith was involved in the reduction in force process or the nature of her involvement.  Plaintiff cannot show causation on this ground.

Haynes' knowledge of Plaintiff's pregnancy is also irrelevant as to this claim—what matters is if and when she knew of Plaintiff's protected activity.  Like Dr. Hawkins, Haynes also learned that Plaintiff reported Trinque in July 2020, four months before Plaintiff's termination on November 13, 2020.  (Am. Compl. ¶ 7; DE 34-2 at 18:7-18:16.)  For the same reasons, that four-month time period is insufficient to establish causation based on a temporal relationship.  Plaintiff also mischaracterizes Haynes' statement to the CFO—she did not recommend Plaintiff for termination but rather, described Plaintiff's position as "not essential" to the Wellness Center.  (DE 34-2 at 49:21-50:7.)  And, as previously discussed, Plaintiff submits no evidence to show that the CFO shared Haynes' input with Dr. Hawkins, that Haynes' input was ever considered as part of the termination decision, or that the CFO played any part in the decision to terminate Plaintiff.  Plaintiff does not point to any evidence to suggest that Haynes actually mentioned Plaintiff or her protected activity in providing her input to the CFO.  Therefore, Plaintiff cannot establish causation based on any temporal relationship between Plaintiff's initial complaint against Trinque and her termination or based on Haynes' discussion with the CFO.

Finally, Plaintiff's "protected activity" of requesting maternity leave four days before her termination cannot establish a causal connection.  "Taking FMLA leave is not a protected activity for the purposes of the KCRA anti-retaliation provision," *Marrero-Perez*, 2022 WL 4368165, at *4, and her request for FMLA leave is not related to her complaint against Trinque.  Regardless, Dr. Hawkins had already decided that Plaintiff's position would be eliminated on November 3, 2020, six days before Plaintiff requested leave on November 9, 2020.  (DE 32-3 ¶ 12; DE 34-15 at 1.)

21

Since Plaintiff cannot establish a causal connection between her first complaint against Trinque and her termination, she has not met her burden to prove her prima facie case of retaliation.

### 2.   Pretext

Even if Plaintiff proved her prima facie case, she cannot show that Defendant's purported reason for her termination was pretext.  For this claim, Plaintiff raises the same arguments for pretext that she raised in connection with her sex and pregnancy discrimination claim.  (DE 34 at 14-15.)  These arguments fail for the same reasons already articulated by the Court.

Therefore, the Court grants summary judgment for Defendant as to Plaintiff's retaliation claim and dismisses the claim.

### D.   FMLA Interference and Retaliation Claims

The FMLA entitles any eligible employee to twelve weeks of leave within a twelve-month period because of the employee's "serious health condition that makes the employee unable to perform the functions of . . . [her] position." 29 U.S.C. § 2612(a)(1)(D).  A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves" either "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  "Continuing treatment by a health care provider" includes "[a]ny period of incapacity due to pregnancy, or for prenatal care." 29 C.F.R. § 825.102.  In short, an eligible employee is entitled to FMLA leave for her pregnancy. *See id.*

An employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise any right" afforded under the FMLA. 29 U.S.C. § 2615(a)(1).  The same *McDonnell Douglas* framework also applies to FMLA interference and retaliation claims based on

circumstantial evidence. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). To establish a prima facie case of FMLA interference, the plaintiff must show that

> (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Id.* at 761 (citation and quotation marks omitted). To establish a prima facie case of FMLA retaliation, the plaintiff must show that

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Id.* (citation and quotation marks omitted).

For these claims, parties seemingly only dispute whether Defendant's purported reason for terminating Plaintiff was pretext. Once again, Plaintiff relies upon the same arguments for pretext that she raised for her sex and pregnancy discrimination claim, and for her retaliation claim. (DE 34 at 14-15.) These arguments fail for the same reasons already provided.

Therefore, the Court grants summary judgment for Defendant as to Plaintiff's FMLA interference and retaliation claims, and dismisses both claims.

Accordingly, the Court grants Defendant's motion for summary judgment in its entirety and dismisses all of Plaintiff's claims.

## E.    Cat's Paw Liability

Under the "cat's paw" theory of liability, a "biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Johnson*, 2023 WL 2326676, at *6 (6th Cir. Mar. 2, 2023) (citation and quotation marks omitted). Plaintiff contends that this theory

applies to all three of her claims.  (DE 34 at 11.)  However, she submits no additional evidence or arguments to support that contention.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citation and quotation marks omitted).  And, as the Court has already discussed, Plaintiff has failed to submit any evidence that Dr. Hawkins' decision to eliminate Plaintiff's position was influenced by any other individual.  Therefore, Plaintiff cannot succeed on any of her claims based on a cat's paw theory of liability.  The Court must grant summary judgment for Defendant and dismiss her claim.

## III.   Motion to Strike

Plaintiff moves to strike two supplemental declarations that Defendant filed in conjunction with its reply brief.  (DE 42.)  Because the Court did not rely on either of those declarations in its analysis, the Court denies the motion as moot.

## IV.   Conclusion

Accordingly, the Court hereby ORDERS as follows:

1.   Defendant Union College's motion for summary judgment (DE 32) is GRANTED in its entirety;

2.   Plaintiff Alexa Carter's claims are DISMISSED with prejudice;

3.   Plaintiff's motion to strike (DE 42) is DENIED as moot;

4.   All other pending motions in this matter are DENIED as moot;

5.   The pretrial conference and jury trial scheduled for this matter are CANCELED;

6.   This matter is STRICKEN from the Court's active docket; and

7.   The Court will enter a judgment consistent with this order.

This 18th day of July, 2023.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY